# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Sep 04, 2018

| | |
|---|---|
| IN RE:<br><br>ROBERTA ELLARAE WRIGHT,<br><br>Debtor. | Case No. 17-11936-M<br>Chapter 7 |
| IN RE:<br><br>IAN GOMES AND STEPHANIE ANN GOMES,<br><br>Debtors. | Case No. 17-11172-M<br>Chapter 7 |
| IN RE:<br><br>BRITTANY MARIE DIRKSWAGER,<br><br>Debtor. | Case No. 17-11410-M<br>Chapter 7 |
| IN RE:<br><br>RYAN MICHAEL BROWN,<br><br>Debtor. | Case No. 17-11411-M<br>Chapter 7 |
| IN RE:<br><br>TOMMY LENARD GUTHRIE and DEBRA DENISE GUTHRIE,<br><br>Debtors. | Case No. 17-11555-M<br>Chapter 7 |

| | |
|---|---|
| **IN RE:** <br><br> **KILEY GENE LAWRENCE,** <br><br> **Debtor.** | **Case No. 17-11557-M** <br> **Chapter 7** |
| **IN RE:** <br><br> **MICHAEL JOE LAWSON AND SARA LYNNE LAWSON,** <br><br> **Debtors.** | **Case No. 17-11558-M** <br> **Chapter 7** |
| **IN RE:** <br><br> **KAREN DAWN INMAN,** <br><br> **Debtor.** | **Case No. 17-11559-M** <br> **Chapter 7** |
| **IN RE:** <br><br> **DAVID CHARLES WILLIAMS,** <br><br> **Debtor.** | **Case No. 17-11688-M** <br> **Chapter 7** |
| **IN RE:** <br><br> **DAPHNE LEANNETTE ROBITAILLE,** <br><br> **Debtor.** | **Case No. 17-11689-M** <br> **Chapter 7** |

| | |
|---|---|
| **IN RE:**<br><br>**KIMBERLY LEANN SULLIVAN,**<br><br>        **Debtor.** | **Case No. 17-11690-M**<br>**Chapter 7** |
| **IN RE:**<br><br>**BRETT WAYNE MURPHY AND APRIL IRENE CONDER,**<br><br>        **Debtors.** | **Case No. 17-11930-M**<br>**Chapter 7** |
| **IN RE:**<br><br>**DANIEL BRUCE BOWERS AND JANIE MAE BOWERS,**<br><br>        **Debtors.** | **Case No. 17-11932-M**<br>**Chapter 7** |
| **IN RE:**<br><br>**DALE DANIEL BURRIS, JR. AND SHEILA MAE BURRIS,**<br><br>        **Debtors.** | **Case No. 17-11933-M**<br>**Chapter 7** |
| **IN RE:**<br><br>**DARIN DWANE MILLER AND KATHY JO MILLER,**<br><br>        **Debtors.** | **Case No. 17-12027-M**<br>**Chapter 7** |

| | |
|---|---|
| **IN RE:**<br><br>**KENNETH CHARLES BURTON,**<br><br>    **Debtor.** | **Case No. 17-12028-M**<br>**Chapter 7** |
| **IN RE:**<br><br>**KIRBY DWAYNE SMITH AND**<br>**REBECCA LEANN SMITH,**<br><br>    **Debtors.** | **Case No. 17-12029-M**<br>**Chapter 7** |

**Memorandum Opinion**

"*. . . ,but at the length truth will out.*"[1]

It is an oft-stated maxim that attorneys are "officers of the court." What exactly does it mean to be an "officer of the court?" Is it enough for an attorney to obtain a desired result for his or her client, even if they mislead, fail to fully inform, or violate rules of the Court in the process? Is a United States Bankruptcy Court a place where, when it comes to the areas of attorney conduct and non-disclosure, no harm equals no foul? Does ignorance of the law excuse misconduct? All of these questions are raised in the seventeen cases presently before the Court. For each question, the answer is the same: absolutely, unequivocally, no.

Before the Court is the Motion for Review of Debtor's Transactions with J. Ken Gallon, Attorney (the "Motion"),[2] filed in Case No. 17-11936-M, *Roberta Ellarae Wright*, by Katherine

---

[1]  William Shakespeare, *The Merchant of Venice* act 2, sc. 2.

[2]  Case No. 17-11936-M, *at Docket No. 38*.

Vance, on behalf of the United States Trustee ("UST"), and 17 contested matters initiated *sua sponte* by the Court in each of the above captioned cases (the "Captioned Cases").[3]  Because the matters are based on substantially identical facts and raise identical issues regarding the conduct of J. Ken Gallon ("Gallon"), counsel for debtors in each of these cases, they were consolidated for purposes of resolution.[4]  The matters discussed herein were first brought to the Court's attention in the *Wright* case, and the Court will continue to treat it as the lead case.  A hearing on the Motion and these contested matters was held on May 10, 2018, at which the Court heard argument and took evidence related to the conduct of Gallon in these cases.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.[5]

### Jurisdiction

The Court has jurisdiction over these bankruptcy cases pursuant to 28 U.S.C.A. § 1334(b).[6]  Reference to the Court of these bankruptcy cases is proper pursuant to 28 U.S.C.A. § 157(a).

---

[3]  Although not all of the Captioned Cases were originally assigned to the undersigned Judge, they were transferred to him after the facts described herein came to light, so that counsel's conduct could be reviewed by the Court in a comprehensive manner.

[4]  *See* Order Scheduling Hearing and Directing Counsel for the Debtor to Address Issues of Compensation, Case No. 17-11936-M, *at Docket No. 60.*  An Order and Notice of Hearing was entered in each of the other Captioned Cases, alerting each debtor to their opportunity to appear and be heard in this matter.

[5]  The Court will recite the factual differences for each specific case, but notes that those differences are immaterial to the Court's analysis and resolution of these matters.

[6]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.*  Unless otherwise noted, all references to a "Rule" or "the Rules" are to the Federal Rules of Bankruptcy Procedure.

Matters concerning the administration of the estate are core proceedings as defined by 28 U.S.C.A.
§ 157(b)(2)(A).

**Findings of Fact**

*1. The BK Billing Model*

Gallon is a consumer debtors' attorney based in Miami, Oklahoma. BK Billing, LLC ("BK
Billing"), a Utah limited liability company, is a finance company that provides factoring services to
bankruptcy counsel in Chapter 7 cases. On May 11, 2017, Gallon executed an Accounts Receivable
Assignment Agreement (the "AR Agreement"), in which he established a factoring arrangement with
BK Billing.[7] The AR Agreement set up a mechanism where Gallon would sell his accounts
receivable for "post-petition services" to Chapter 7 consumer debtors based on client contracts that
he uploaded to the BK Billing system. Gallon ultimately factored, or sold, 14 client contracts to BK
Billing under the AR Agreement ("the BK Billing Cases"). Under the original AR Agreement,
Gallon agreed to transfer each account receivable in exchange for 70% of the total contractual value
of the account, which amount was to be received by Gallon with 2-3 business days.[8] An amendment
executed on July 5, 2017, increased the total amount paid to Gallon upon the submission of an
account to 75% of the value of the contract, but lowered the amount immediately available to Gallon
to 60%, and set the other 15% aside in an escrow account to be maintained by BK Billing as security
for performance of the transferred accounts.[9] The AR Agreement gives BK Billing the "right to

---

[7] Trial Ex. 22.

[8] *Id.* at 1, § 1.

[9] Trial Ex. 23 at 1, § 2.1. Except for Case No. 17-11172-M, *Gomes*, all of the BK Billing
Cases were submitted pursuant to the amended AR Agreement. All further references to the AR
Agreement will refer to the agreement as amended.

6

approve of [Gallon's] form engagement agreement prior to accepting any [accounts]."[10]  In addition, Gallon is obligated to "cooperate with the collections by BK Billing of the [accounts], including, but not limited to providing evidence reasonably required for any legal action, arbitration, or mediation instituted by BK Billing for collection purposes, and permitting BK Billing to use [Gallon's] name, address, and telephone number for collection purposes."[11]

In addition to the factoring services, BK Billing provided Gallon with various pleadings and templates to effectuate a business model whereby Gallon would enter two separate retention agreements with his clients.  The first, executed prior to filing a Chapter 7 bankruptcy case, was for services up to and including filing the petition.  The second, executed after the case was filed, was for all remaining services that were rendered to a debtor post-petition.

At a hearing in these matters, Gallon testified that upon meeting with a new client, if he determined that the client was in need of immediate bankruptcy relief but was unable to pay his fee prior to filing the case, Gallon would present them with the "BK Billing Model."[12]   Key features of the BK Billing Model include:

---

[10]  Trial Ex. 22 at 2, § 4.2.

[11]  *Id.* at 3, § 4.4.

[12]  Gallon did not use this terminology, but the Court will use the term "BK Billing Model" to refer to the two contract bifurcated filing system provided by BK Billing, which included the factoring of Gallon's attorney fees.

A.   The debtors entered into a "Contract for Pre-Petition Legal Services in a Chapter 7 Bankruptcy Case" (the "Pre-Petition Agreement")[13] with Gallon.[14]

B.   Under the Pre-Petition Agreement, the debtors were to pay Gallon a specified fee[15] for various pre-petition bankruptcy services, including "meeting and consulting with [Gallon] as needed," a "detailed analysis of [] client questionnaire," and "preparation and filing of a Chapter 7 Voluntary Petition, Statement About Social Security Numbers[.]"[16]   The debtors agreed to pay additional fees for a "Pre-filing Credit Counseling Briefing Certificate" and a credit report.

C.   The Pre-Petition Agreement gave the debtors the option to pay the Bankruptcy Court filing fee of $335 in full up front, apply to pay it in installments, or request that Gallon pay the fee and seek reimbursement from the debtors at a later time.

D.   The Pre-Petition Agreement stated that Gallon's contractual responsibilities would end "upon completion of the filing of [the] bankruptcy case."  It also stated that "the Law Firm will remain professionally obligated to serve as counsel for Client in the case until the Bankruptcy Court allows the Law Firm to formally withdraw."[17]

---

[13]   *See, e.g.*, Trial Ex. 14.1 (*Wright*).  Substantially similar agreements were entered with each of the debtors in the Captioned Cases.

[14]   In the contracts with debtors, Gallon represented himself as the "Law Firm."  The Court will use the term "Gallon" to refer to both J. Ken Gallon, as attorney, and any law firm he may represent.

[15]   This amount varied by debtor.  Details for each debtor are discussed in the next section.

[16]   Trial Ex. 14.1 at 1.

[17]   *Id.*

8

E.     The Pre-Petition Agreement laid out various options regarding the completion of the debtors' bankruptcy case through discharge.  The debtors could 1) retain Gallon under a second retainer agreement to be executed post-petition, where Gallon would complete the case for an additional specified fee;[18] 2) seek other counsel to complete the case; or 3) proceed without legal representation, i.e., *pro se*.  If the debtors did not choose to retain Gallon for post-petition services within 10 days after filing the bankruptcy petition, they agreed to consent to Gallon's withdrawal as counsel in the case.  The Pre-Petition Agreement also placed the responsibility on the debtors to notify their creditors once the bankruptcy case was filed.

F.     After execution of the Pre-Petition Agreement, Gallon filed what is colloquially referred to as a "bare-bones" Chapter 7 petition on behalf of the debtors.  That means the documents filed represent the bare minimum necessary to successfully open a bankruptcy case and invoke the automatic stay.  In all cases, this consisted of Official Form 101, Voluntary Petition for Individuals Filing for Bankruptcy, required by Rule 1002(a); a Certificate of Counseling, required by Rule 1007(b)(3)(A); a list of creditors, required by Rule 1007(a)(1); and a Verification as to Official Mailing Matrix, required by Rule 1008.[19]  In the seven cases filed prior to August 24, 2017, the initial filing also included Official Form 106Sum, Summary of Your Assets and

---

[18]  *See supra* note 15.  As far as the Court is aware, all of the debtors that executed a Pre-Petition Agreement chose this option.

[19]  The *Sullivan* case included this list of documents plus the Official Form 106Sum, Summary of Your Assets and Liabilities and Certain Statistical Information, required by Bankr. N.D. Okla. Local Rule 1007-1(G).

Liabilities and Certain Statistical Information, required by Bankr. N.D. Okla. Local Rule 1007-1(G); Official Form 106D, Schedule D: Creditors Who Have Claims Secured by Property, required by Rule 1007(b)(1)(A); Official Form 106E/F, Schedule E/F: Creditors Who Have Unsecured Claims, required by Rule 1007(b)(1)(A); and Official Form 106Dec, Declaration About an Individual Debtor's Schedules, required by Rule 1008.[20]

G.     In eleven of the seventeen Captioned Cases, Gallon filed Bankruptcy Form 103A, Application for Individuals to Pay the Filing Fee in Installments (the "Installment Application"), on behalf of the debtors, requesting that they be allowed to pay the Court filing fee in installments of $83.75 per month for four months, beginning one month from the date the petition was filed. At the time the Installment Application was filed in each case, the Court had no information regarding the financial condition of the debtors, i.e., no schedules of current income or expenditure had been filed.

H.     In each of the BK Billing Cases, Gallon and the debtors executed a "Contract for Post-Petition Legal Services in a Chapter 7 Bankruptcy Case" (the "Post-Petition Agreement").[21]  In the Post-Petition Agreement, the debtors agreed to retain Gallon to represent them in the post-petition proceedings of their bankruptcy case in

---

[20]  These cases were *Gomes*, *Dirkswager*, *Brown*, *Inman*, *Lawrence*, *Guthrie*, and *Lawson*.

[21]  Trial Ex. 14.2.

exchange for a specified fee,[22] described as a non-refundable flat fee.  Gallon agreed

to perform the following services for debtors:

1) Preparation and filing of the Statement of Financial Affairs and Schedules;

2) Preparation for and attendance at the Section 341 Meeting of Creditors;

3) Review and attendance (if necessary) to motions for stay relief;

4) Review of any redemption agreements;

5) Review of any reaffirmation agreements;

6) Follow through with case administration and monitoring;

7) File motions to reopen (if necessary)[.][23]

I.    The Post-Petition Agreement included the following statements:

**I acknowledge and agree that as all of these fees are for post-petition services, they are not dischargeable in my Chapter 7 case.  In the event of nonpayment of the agreed-upon fees, the Law Firm may commence legal proceedings for collection.**

I understand that the Law Firm may assign my post-petition accounts receivable to BK Billing, LLC.  I authorize the Law Firm or BK Billing to communicate with me via e-mail, text, and/or telephone. I explicitly give my consent to the Law Firm to share my client file information with BK Billing, including my contact information and social security number.  I acknowledge that my payments to BK Billing will be reported to credit bureaus.  I acknowledge that on-time payments can help my credit and late payments can hurt my credit.  I have been provided an opportunity to ask the Law Firm questions regarding the Law Firm's accounts receivable assignment agreement with BK Billing.  The Law Firm has answered all such questions to my satisfaction.

I agree to submit to the personal jurisdiction of the Oklahoma courts with respect to such action, and Oklahoma law will apply.  If such collection procedures shall

---

[22] *See supra* note 15.

[23] Trial Ex. 14.2 at 1.

become necessary, I agree to pay all reasonable costs of such collection, including reasonable attorney fees.

I understand that I am to notify my creditors of my bankruptcy case once my case is filed.[24]

J.      Attached to the Post-Petition Agreement was a "Recurring Payment Authorization and Consent Form" in which the debtors authorized Gallon or BK Billing, LLC, referred to as an "independent billing company," to charge their debit card a specified fee per month until a specified amount was paid in full.[25]  That form included the following statement:

I give my consent that the Law Firm may sell or factor the accounts receivable associated with my contract to BK Billing. I acknowledge my payments would then be made directly to BK Billing on behalf of the Law Firm. I authorize the Law Firm or BK Billing to communicate with me via mail, e-mail, text, and/or telephone. I give my consent for the Law Firm to share my client file information, including my Social Security Number, with BK Billing for the purpose of processing and reporting my payments. I acknowledge that my payments may be reported to the Credit Bureaus. I acknowledge that on-time payments may help my credit and late payments may hurt my credit.[26]

K.      In all of the Captioned Cases, Gallon filed the remaining schedules and statements required by § 521 and Rule 1007(b) sometime after the petition date.

L.      Among the documents filed post-petition in each case was a Disclosure of Compensation of Attorney for Debtor ("Disclosure of Compensation"), which

---

[24]  *Id.* at 2–3 (emphasis added).  The last sentence was included in each of the Post-Petition Agreements, but it was set out separately in bold and underlined, with instruction for the debtor to initial the clause, only in the *Wright* case.

[25]  *See supra* note 15.

[26]  *Motion*, Case No. 17-11936-M, *at Docket No. 38* at 9.

indicated that Gallon had agreed to accept a specified fee[27] "for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case."[28]  Gallon stated that he had received a specified fee[29] prior to filing the statement, leaving a specified balance due.[30]  In every case, he checked the box next to the statement "I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm." Gallon also indicated that "by agreement with the debtor(s), the above-disclosed fee does not include the following service:   1) Lien Avoidance; 2) Adversary Proceeding; 3) Judgment Lien Removal; 4) Re-Affirmation (sic) Agreement; 5) Re-Affirmation (sic) Agreement Recession; 6) Amendment to Peition (sic), Schedules and Statements; 7) Objection to Discharge."[31]

*2.  The debtors*

The facts in each of the Captioned Cases are as follows:

*a.  BK Billing Cases*

*Roberta Ellarae Wright, Case No. 17-11936-M*

On September 12, 2017, Roberta Ellarae Wright ("Wright") retained Gallon under a Pre-Petition Agreement, where she agreed to pay $200 for pre-petition services in a Chapter 7

---

[27] *See supra* note 15.

[28] Bankruptcy Form 2030.

[29] *See supra* note 15.

[30] *Id.*

[31] Trial Ex. 14.5.

bankruptcy case, plus $9 for credit counseling and $33 for a credit report.[32]   The Pre-Petition

Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings

for $1,350.  Wright's case, Case No. 17-11936-M, was filed on September 28, 2017.  On October

5, 2017, Wright executed a Post-Petition Agreement, where she agreed to pay $1,425 as a flat fee

for Gallon to represent her in the completion of the case.[33]   No receipt was offered to show the

amount received by Gallon. What appears to be an internal information sheet was offered to show

that Gallon received $200 from Wright.[34]   Under the AR Agreement, Gallon received $855 from BK

Billing upon submission of the Wright account, with an additional $213.75 placed in escrow.[35]   The

Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had

received $75; leaving a balance due of $1,425.[36]   Wright's Statement of Financial Affairs ("SOFA")

disclosed that she had paid Gallon $125 (date not indicated), and included the description "Prepare

petition schedules & Statements, credit counseling, credit report."[37]   Gallon filed an Installment

Application on behalf of Wright.[38]   The final installment of Wright's filing fee was paid on

---

[32]  Trial Ex. 14.1.

[33]  Trial Ex. 14.2.

[34]  Trial Ex. 14.3.

[35]  Trial Ex. 14.4.  This is based on an invoice amount of $1,425, which BK Billing was to collect from Wright.

[36]  Trial Ex. 14.6.

[37]  Trial Ex. 14.7.

[38]  Case No. 17-11936-M, *at Docket No. 4*.

December 6, 2017.  BK Billing collected $118.75 from Wright on October 15, 2017, a date before the filing fee was paid in full.[39]

*Ian Gomes and Stephanie Ann Gomes*, *Case No. 17-11172-M*

On June 12, 2017, Ian Gomes and Stephanie Ann Gomes (the "Gomeses") retained Gallon under a Pre-Petition Agreement, where they agreed to pay $100 for pre-petition services in a Chapter 7 bankruptcy case.[40]   The Pre-Petition Agreement gave them the option of retaining Gallon to complete their case in post-petition proceedings for $1,400.  Their case, Case No. 17-11172-M,  was filed on June 13, 2017.  On that same date, the Gomeses executed a Post-Petition Agreement, where they agreed to pay $1,400 as a flat fee for Gallon to represent them in the completion of their case.[41] A receipt shows that Gallon received $500 in cash from Ian Gomes on June 12, 2017, which was described as a "Bankruptcy Retainer."[42]   Under the original AR Agreement, Gallon received $980 from BK Billing upon submission of the Gomeses' account.[43]   The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[44]   The Gomeses' SOFA disclosed they had paid Gallon $100 on June 12, 2017, and that "[t]he Debtors paid $100 dollars to prepare and to file the Petition, Credit Counseling, Creditors and Verification of Creditors. Debotrs [sic] paid $400 was for [sic] the Filing Fee, Credit

---

[39]  Trial Ex. 14.4.

[40]  Trial Ex. 1.1.

[41]  Trial Ex. 1.2.

[42]  Trial Ex. 1.3.

[43]  Trial Ex. 1.4. *See supra* note 13.

[44]  Trial Ex. 1.6.

Counseling Course, Debtors Education Course and the Credit Report."[45]  The filing fee of $335 was

paid on the filing date.

*Ryan Michael Brown, Case No. 17-11411-M*

On July 14, 2017, Ryan Michael Brown ("Brown") retained Gallon under a Pre-Petition

Agreement, where he agreed to pay $158 for pre-petition services in a Chapter 7 bankruptcy case,

plus $9 for credit counseling and $33 for a credit report.[46]  The Pre-Petition Agreement gave him the

option of retaining Gallon to complete his case in post-petition proceedings for $1,400.  Brown's

case, Case No. 17-11411-M, was filed on July 14, 2017.  On July 24, 2017, Brown executed a

Post-Petition Agreement, where he agreed to pay $1,350 as a flat fee for Gallon to represent him in

the completion of the case.[47]  A receipt shows that Gallon received $200 in cash from Brown on July

7, 2017, which was described as a "Attorney Fee's [sic] to file Petition; For CC CR."[48]  Under the

AR Agreement, Gallon received $810 from BK Billing upon submission of the Brown account, with

an additional $202.50 placed in escrow.[49]  The Disclosure of Compensation recited that, for legal

services, Gallon had agreed to accept $1,500; had received $150; leaving a balance due of $1,350.

Brown's SOFA disclosed that he had paid Gallon $200 on July 11, 2017.  Gallon filed an Installment

Application on behalf of Brown.[50]  The final installment of Brown's filing fee was paid on

---

[45]  Trial Ex. 1.7.

[46]  Trial Ex. 2.1.

[47]  Trial Ex. 2.2.

[48]  Trial Ex. 2.3.

[49]  Trial Ex. 2.4.

[50]  Case No. 17-11411-M, *at Docket No. 2*.

November 14, 2017.  BK Billing collected $112.50 from Brown on September 15, 2017, September 29, 2017, and November 2, 2017, all dates before the filing fee was paid in full.[51]

*Brittany Marie Dirkswager, Case No. 17-11410-M*

Sometime in June 2017, Brittany Marie Dirkswager ("Dirkswager") retained Gallon under a Pre-Petition Agreement, where she agreed to pay $1,400 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[52]  The Pre-Petition Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings for $1,400.  Dirkswager's case, Case No. 17-11410-M, was filed on July 14, 2017.  On July 19, 2017, Dirkswager executed a Post-Petition Agreement, where she agreed to pay $1,400 as a flat fee for Gallon to represent her in the completion of the case.[53]  No receipt was offered to show the actual amount received by Gallon.  Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Dirkswager account, with an additional $210 placed in escrow.[54]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[55]  Dirkswager's SOFA disclosed that she had paid Gallon $150 on June 22, 2017, and that "[t]he Debtor paid $100 dollars to file the Petition, Credit Counseling Course, Creditors, Verification of Creditors. The Debtor paid $50 for the Credit

---

[51] Trial Ex. 2.4.

[52] Trial Ex. 3.1.  The Court hesitates to refer to the $1,400 as a "typo" because it was written into a blank by hand, but it does appear to be a mistake.

[53] Trial Ex. 3.2.

[54] Trial Ex. 3.4.

[55] Trial Ex. 3.6.

Counseling Course and Credit Report."[56] Gallon filed an Installment Application on behalf of Dirkswager.[57] The final installment of Dirkswager's filing fee was paid on November 28, 2017. BK Billing collected $58.33 from Dirkswager on September 1, 2017, September 26, 2017, October 7, 2017, October 20, 2017, and November 10, 2017, all dates before the filing fee was paid in full.[58]

*Tommy Lenard Guthrie and Debra Denise Guthrie, Case No. 17-11555-M*

No Pre-Petition Agreement was offered to show when or the terms under which Tommy Lenard Guthrie and Debra Denise Guthrie (the "Guthries") retained Gallon. Their Chapter 7 bankruptcy case, Case No. 17-11555-M, was filed on August 4, 2017. On August 9, 2017, the Guthries executed a Post-Petition Agreement, where they agreed to pay $1,400 as a flat fee for Gallon to represent them in the completion of their case.[59] A receipt shows that Gallon received $500 by credit card from Debra Guthrie on July 28, 2017, which was described as "for payment of Bankruptc" [sic].[60] Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Guthries' account, with an additional $210 placed in escrow.[61] The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[62] The Guthries' SOFA disclosed that they had paid Gallon

---

[56] Trial Ex. 3.7.

[57] Case No. 17-11410-M, *at Docket No. 2*.

[58] Trial Ex. 3.4.

[59] Trial Ex. 4.2.

[60] Trial Ex. 4.3.

[61] Trial Ex. 4.4.

[62] Trial Ex. 4.6.

$500 (date not indicated), and included the description "Form 122, prepare petition & creditor matrix. pull credit report and credit counseling."[63] The filing fee of $335 was paid on the filing date.

*Karen Dawn Inman, Case No. 17-11559-M*

On July 5, 2017, Karen Dawn Inman ("Inman") retained Gallon under a Pre-Petition Agreement, where she agreed to pay $1,400 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[64] The Pre-Petition Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings for $1,400. Inman's case, Case No. 17-11559-M, was filed on August 4, 2017. On August 8, 2017, Inman executed a Post-Petition Agreement, where she agreed to pay $1,400 as a flat fee for Gallon to represent her in the completion of the case.[65] A receipt shows that Gallon received $100 from Inman on July 6, 2017, which was described as "CR & CC for BK."[66] Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Inman, with an additional $210 placed in escrow.[67] The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[68] Inman's SOFA disclosed that she had paid Gallon $150 (date not indicated), and included the description "Credit Report, Credit Couseling [sic] and

---

[63] Trial Ex. 4.7.

[64] Trial Ex. 5.1.

[65] Trial Ex. 5.2.

[66] Trial Ex. 5.3. The method of payment was not indicated.

[67] Trial Ex. 5.4.

[68] Trial Ex. 5.6.

attorney fees."[69]  Gallon filed an Installment Application on behalf of Inman.[70]  The final installment of Inman's filing fee was paid on November 22, 2017.  BK Billing collected $116 from Inman on September 1, 2017, October 1, 2017, and November 1, 2017, all dates before the filing fee was paid in full.[71]

*Kiley Gene Lawrence, Case No. 17-11557-M*

On August 1, 2017, Kiley Gene Lawrence ("Lawrence") retained Gallon under a Pre-Petition Agreement, where she agreed to pay $100 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[72]  The Pre-Petition Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings for $1,400.  Lawrence's case, Case No. 17-11557-M, was filed on August 4, 2017.  On August 9, 2017, Lawrence executed a Post-Petition Agreement, where she agreed to pay $1,400 as a flat fee for Gallon to represent her in the completion of the case.[73]  A receipt shows that Gallon received $153 in cash from Lawrence on August 1, 2017, which was described as "Attorney Fee's [sic] – BK."[74]  Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Lawrence account, with

---

[69]  Trial Ex. 5.7.

[70]  Case No. 17-11559-M, *at Docket No. 2.*

[71]  Trial Ex. 5.4.

[72]  Trial Ex. 6.1.  Handwriting obscures the amount of $53 for a credit report on the exhibit submitted to the Court, but its intent in changing the meaning of the printed text is unclear.

[73]  Trial Ex. 6.2.

[74]  Trial Ex. 6.3.

an additional $210 placed in escrow.[75]   The Disclosure of Compensation recited that, for legal

services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[76]

Lawrence's SOFA disclosed that she had paid Gallon $150 (date not indicated), and included the

description "payment for credit report, credit counseling & fees."[77]   Gallon filed an Installment

Application on behalf of Lawrence.[78]   The final installment of Lawrence's filing fee was paid on

December 4, 2017.   BK Billing collected $120 from Lawrence on September 6, 2017, October 6,

2017, and November 6, 2017, all dates before the filing fee was paid in full.[79]

*Michael Joe Lawson and Sara Lynne Lawson, Case No. 17-11558-M*

On July 27, 2017, Michael Joe Lawson and Sara Lynne Lawson (the "Lawsons") retained

Gallon under a Pre-Petition Agreement, where they agreed to pay $40 for pre-petition services in a

Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[80]   The

Pre-Petition Agreement gave them the option of retaining Gallon to complete their case in

post-petition proceedings for $1,400.   Their Chapter 7 bankruptcy case, Case No. 17-11558-M, was

filed on August 4, 2017.   On August 15, 2017, the Lawsons executed a Post-Petition Agreement,

where they agreed to pay $1,460 as a flat fee for Gallon to represent them in the completion of their

---

[75]   Trial Ex. 6.4.

[76]   Trial Ex. 6.6.

[77]   Trial Ex. 6.7.

[78]   Case No. 17-11557-M, *at Docket No. 2.*

[79]   Trial Ex. 6.4.

[80]   Trial Ex. 7.1.

case.[81]  A receipt shows that Gallon received $100 in cash from Sara Lawson on July 27, 2017,

which was described as "for BK [unreadable]."[82]  Under the AR Agreement, Gallon received $876

from BK Billing upon submission of the Lawson account, with an additional $219 placed in

escrow.[83]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to

accept $1,500; had received $40; leaving a balance due of $1,460.[84]  The Lawsons' SOFA disclosed

that they had paid Gallon $100 (date not indicated), and included the description "prepare petition,

e, f, creditor matrix and run credit report and credit counseling."[85]  Gallon filed an Installment

Application on behalf of the Lawsons.[86]  The final installment of the Lawsons' filing fee was paid

on November 30, 2017.  BK Billing collected $121.66 from the Lawsons on September 1, 2017,

October 1, 2017, and November 1, 2017, all dates before the filing fee was paid in full.[87]

*Kimberly LeAnn Sullivan, Case No. 17-11690-M*

An undated and unexecuted Pre-Petition Agreement was offered as evidence that Kimberly

LeAnn Sullivan ("Sullivan") retained Gallon, where she agreed to pay $110 for pre-petition services

in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $33 for a credit report.[88]  The

---

[81]  Trial Ex. 7.2.

[82]  Trial Ex. 7.3.

[83]  Trial Ex. 7.4.

[84]  Trial Ex. 7.6.

[85]  Trial Ex. 7.7.

[86]  Case No. 17-11558-M, *at Docket No. 2*.

[87]  Trial Ex. 7.4.

[88]  Trial Ex. 8.1.  The document was executed by Gallon, but not by Sullivan.

Pre-Petition Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings for $1,400.  Sullivan's case, Case No. 17-11690-M, was filed on August 24, 2017.  On August 25, 2017, Sullivan executed a Post-Petition Agreement, where she agreed to pay $1,400 as a flat fee for Gallon to represent her in the completion of the case.[89]  A receipt shows that Gallon received $500 in cash from Sullivan on August 17, 2017, without further notation.[90]  Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Sullivan account, with an additional $210 placed in escrow.[91]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[92]  Sullivan's SOFA disclosed that she had paid Gallon $500 (date not indicated), and included the description "prepare petition, verify creditors, pull credit report, credit counseling."[93]  The filing fee of $335 was paid on the filing date.

*David Charles Williams, Case No. 17-11688-M*

On August 22, 2017, David Charles Williams ("Williams") retained Gallon under a Pre-Petition Agreement, where he agreed to pay $200 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $33 for a credit report.[94]  The Pre-Petition Agreement gave him the option of retaining Gallon to complete his case in post-petition proceedings

---

[89]  Trial Ex. 8.2.

[90]  Trial Ex. 8.3.

[91]  Trial Ex. 8.4.

[92]  Trial Ex. 8.6.

[93]  Trial Ex. 8.7.

[94]  Trial Ex. 9.1.

23

for $1,300.  Williams's case, Case No. 17-11688-M, was filed on August 24, 2017.  On August 25,

2017, Williams executed a Post-Petition Agreement, where he agreed to pay $1,300 as a flat fee for

Gallon to represent him in the completion of the case.[95]  A receipt shows that Gallon received $600

in cash from Williams on June 23, 2017, which was described as "Attorney Fee's [sic] BK"[96] The

receipt also shows an amount due of $1680, and a balance (due) of $1080.  Under the AR

Agreement, Gallon received $780 from BK Billing upon submission of the Williams account, with

an additional $195 placed in escrow.[97]  The Disclosure of Compensation recited that, for legal

services, Gallon had agreed to accept $1,500; had received $200; leaving a balance due of $1,300.

Williams's SOFA disclosed that he had paid Gallon $600 (date not indicated), and included the

description "prepare petition, creditor matrix and verifcation [sic], obtain credit report, filing fee and

credit counseling."[98]  The filing fee of $335 was paid on the filing date.

*Daphne Leannette Robitaille, Case No. 17-11689-M*

On August 1, 2017, Daphne Leannette Robitaille ("Robitaille") retained Gallon under a

Pre-Petition Agreement, where she agreed to pay $100 for pre-petition services in a Chapter 7

bankruptcy case, plus $9 for credit counseling and $33 for a credit report.[99]  The Pre-Petition

Agreement gave her the option of retaining Gallon to complete her case in post-petition proceedings

for $1,400.  Robitaille's case, Case No. 17-11689-M, was filed on August 24, 2017.  On August 25,

---

[95]  Trial Ex. 9.2.

[96]  Trial Ex. 9.3.

[97]  Trial Ex. 9.4.

[98]  Trial Ex. 9.7.

[99]  Trial Ex. 10.1.

2017, Robitaille executed a Post-Petition Agreement, where she agreed to pay $1,400 as a flat fee for Gallon to represent her in the completion of the case.[100]  A receipt shows that Gallon received $150 in cash from Robitaille on August 1, 2017, which was described as "50 CC & CR & 100 [unreadable]."[101]  Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Robitaille account, with an additional $210 placed in escrow.[102]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[103]  Robitaille's SOFA disclosed that she had paid Gallon $150 (date not indicated), and included the description "prepare petition, creditor verifcation [sic], credit report & credit counseling."[104]  Gallon filed an Installment Application on behalf of Robitaille.[105] The final installment of Robitaille's filing fee was paid on December 18, 2017.  BK Billing collected $116.66 from Robitaille on September 11, 2017, October 5, 2017, and November 5, 2017, all dates before the filing fee was paid in full.[106]

---

[100]  Trial Ex. 10.2.

[101]  Trial Ex. 10.3.

[102]  Trial Ex. 10.4.

[103]  Trial Ex. 10.6.

[104]  Trial Ex. 10.7.

[105]  Case No. 17-11689-M, *at Docket No. 3*. An amended application was filed at Docket No. 10 to change the due dates for payments.  This amended application was later granted by the Court.  *See Docket No. 16.*

[106]  Trial Ex. 10.4.

25

*Daniel Bruce Bowers and Janie Mae Bowers, Case No. 17-11932-M*

On September 22, 2017, Daniel Bruce Bowers and Janie Mae Bowers (the "Bowers") retained Gallon under a Pre-Petition Agreement, where they agreed to pay $500 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[107] The Pre-Petition Agreement gave them the option of retaining Gallon to complete their case in post-petition proceedings for $1,400.  Their Chapter 7 bankruptcy case, Case No. 17-11932-M, was filed on September 28, 2017.  On September 29, 2017, the Bowers executed a Post-Petition Agreement, where they agreed to pay $575 as a flat fee for Gallon to represent them in the completion of their case.[108]  A receipt shows that Gallon received $1,000 in cash from Bruce Bowers on September 19, 2017, which was described as "Retainer for BK."[109]  Under the AR Agreement, Gallon received $345 from BK Billing upon submission of the Bower account, with an additional $86.25 placed in escrow.[110]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $1,000; leaving a balance due of $500.[111]  The Bowers' SOFA disclosed that they had paid Gallon $1,000 (date not indicated), and included the description "prepare petition schedules & statements, filing fee, credit counseling."[112]  The filing fee of $335 was paid on the filing date.

---

[107]  Trial Ex. 11.1.

[108]  Trial Ex. 11.2.

[109]  Trial Ex. 11.3.

[110]  Trial Ex. 11.4.

[111]  Trial Ex. 11.6.

[112]  Trial Ex. 11.7.

*Dale Daniel Burris, Jr. and Sheila Mae Burris, Case No. 17-11933-M*

An undated and unexecuted Pre-Petition Agreement was offered as evidence that Dale Daniel Burris, Jr. and Sheila Mae Burris (the "Burrises") retained Gallon, where they agreed to pay $90 for pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a credit report.[113] The Pre-Petition Agreement gave them the option of retaining Gallon to complete their case in post-petition proceedings for $1,410.   Their Chapter 7 bankruptcy case, Case No. 17-11933-M, was filed on September 28, 2017.  On September 29, 2017, the Burrises executed a Post-Petition Agreement, where they agreed to pay $1,400 as a flat fee for Gallon to represent them in the completion of their case.[114]  No receipt was offered to show the actual amount received by Gallon. Under the AR Agreement, Gallon received $840 from BK Billing upon submission of the Burris account, with an additional $210 placed in escrow.[115]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,250; had received $0; leaving a balance due of $1,250.[116]  The Burrises' SOFA disclosed that they had paid Gallon $150 (date not indicated), and included the description "Prepare petition, schedules & statements, credit report, credit

---

[113]  Trial Ex. 12.1.  The document was not executed by any party.

[114]  Trial Ex. 12.2.

[115]  Trial Ex. 12.4.  This is based on an invoice amount of $1,400, which BK Billing was to collect from the Burrises.

[116]  Trial Ex. 12.6.  On October 20, 2017, an amended Disclosure of Compensation was filed, which recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400. *See* Case No. 17-11933-M, *at Docket No. 18*.

27

counseling."[117]   Gallon filed an Installment Application on behalf of the Burrises.[118]   The final

installment of the Burrises' filing fee was paid on November 27, 2017.  BK Billing collected $58.34

from the Burrises on October 13, 2017, October 21, 2017, and November 4, 2017, all dates before

the filing fee was paid in full.[119]

*Brett Wayne Murphy and April Irene Conder, Case No. 17-11930-M*

On September 28, 2017, Brett Wayne Murphy ("Murphy") and April Irene Conder

("Conder"), retained Gallon under a Pre-Petition Agreement, where they agreed to pay $100 for

pre-petition services in a Chapter 7 bankruptcy case, plus $9 for credit counseling and $53 for a

credit report.[120] The Pre-Petition Agreement gave them the option of retaining Gallon to complete

their case in post-petition proceedings for $1,400.   Their Chapter 7 bankruptcy case, Case No. 17-

11930-M, was filed on September 28, 2017.  On September 29, 2017, Murphy and Conder executed

a Post-Petition Agreement, where they agreed to pay $1,400 as a flat fee for Gallon to represent them

in the completion of their case.[121]   A receipt shows that Gallon received $500 in cash from Murphy

and Conder on September 20, 2017.[122]   Under the AR Agreement, Gallon received $840 from BK

Billing upon submission of the Murphy/Conder account, with an additional $210 placed in escrow.[123]

---

[117]  Trial Ex. 12.7.

[118]  Case No. 17-11933-M, *at Docket No. 3*.

[119]  Trial Ex. 12.4.

[120]  Trial Ex. 13.1.

[121]  Trial Ex. 13.2.

[122]  Trial Ex. 13.3.

[123]  Trial Ex. 13.4.

The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[124]  Murphy's and Conder's SOFA disclosed that they had paid Gallon $500 (date not indicated), and included the description "Prepare petition ceritors [sic] & verifcation. [sic] Credit report, credit counseling & filing fee."[125]  The filing fee of $335 was paid on the filing date.

   *b.  Non-Factored Cases*[126]

   *Kenneth Charles Burton, Case No. 17-12028-M*

   On October, 12, 2017, Kenneth Charles Burton ("Burton") filed a petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 17-12028-M.  The bare bones petition was filed by Gallon as counsel.  A receipt shows that Gallon received $150 in cash from Burton on October 3, 2017."[127]  No Pre-Petition Agreement was offered to show the terms under which Burton retained Gallon.  According to Gallon, no Post-Petition Agreement was executed with Burton because Gallon had ceased doing business with BK Billing and had agreed to complete the Burton case pending further Court review.[128]  The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $100; leaving a balance due of $1,400.[129]  Burton's SOFA

---

[124]  Trial Ex. 13.6.

[125]  Trial Ex. 13.7.

[126]  The Non-Factored Cases are those initiated by Gallon under the BK Billing Model, but whose accounts were never submitted to BK Billing because of the issues raised at the October 17 Hearing. *See infra* text accompanying note 150.

[127]  Trial Ex. 15.3.

[128]  Trial Tr. at 25–26, May 10, 2018, Case No. 11936-M, *at Docket No. 71.*

[129]  Trial Ex. 15.6.

disclosed that he had paid Gallon $150 (date not indicated), and included the description "prepare petition, schedules, statements, credit counseling, credit report150"[130] Gallon filed an Installment Application on behalf of Burton.[131]

*Darin Dwane Miller and Kathy Jo Miller, Case No. 17-12027-M*

On October, 12, 2017, Darin Dwane Miller and Kathy Jo Miller (the "Millers") filed a petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 17-12027-M. The bare bones petition was filed by Gallon as counsel. No receipt was offered to show the amount received by Gallon. No Pre-Petition Agreement was offered to show the terms under which the Millers retained Gallon. According to Gallon, no Post-Petition Agreement was executed with the Millers because Gallon had ceased doing business with BK Billing and had agreed to complete the Miller case pending further Court review.[132] The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $130; leaving a balance due of $1,370.[133] The Millers' SOFA disclosed that they had paid Gallon $200 (date not indicated), and included the description "prepare petition schedules & statements, credit counseling, credit report."[134] Gallon

---

[130] Trial Ex. 15.7.

[131] Case No. 17-12028-M, *at Docket No. 3*. An amended application was filed at Docket No. 13 to change the due dates for payments. This amended application was later granted by the Court. *See Docket No. 15*.

[132] Trial Tr. at 25–26, May 10, 2018, Case No. 11936-M, *at Docket No. 71*.

[133] Trial Ex. 16.6.

[134] Trial Ex. 16.7.

filed an Installment Application on behalf of the Millers.[135] Although Gallon had no contract or agreement with the Millers, they voluntarily paid Gallon $1,325 post-petition.[136]

*Kirby Dwayne Smith and Rebecca Leann Smith, Case No. 17-12029-M*

On October, 12, 2017, Kirby Dwayne Smith and Rebecca Leann Smith (the "Smiths") filed a petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 17-12029-M. The bare bones petition was filed by Gallon as counsel. A receipt shows that Gallon received $200 by check from Kirby Smith on October 9, 2017.[137] No Pre-Petition Agreement was offered to show the terms under which the Smiths retained Gallon. According to Gallon, no Post-Petition Agreement was executed with the Smiths because Gallon had ceased doing business with BK Billing and had agreed to complete the Smith case pending further Court review.[138] The Disclosure of Compensation recited that, for legal services, Gallon had agreed to accept $1,500; had received $125; leaving a balance due of $1,375.[139] The Smiths' SOFA disclosed that they had paid Gallon $200 (date not indicated), and

---

[135] Case No. 17-12027-M, *at Docket No. 3*. An amended application was filed at Docket No. 14 to change the due dates for payments. This amended application was later granted by the Court. *See Docket No. 15.*

[136] According to Gallon, "Mrs. Miller called me up and basically told me that she had received her income tax return and that she wanted me to get paid and I told her I didn't really know what was going on, but she said that she wanted to pay me. And so I accepted the payment." *See* Trial Tr. at 27 *ll*. 12–16, May 10, 2018, Case No. 11936-M, *at Docket No. 71*. *See also* Trial Ex. 19 (note regarding *Miller* case).

[137] Trial Ex. 17.3.

[138] Trial Tr. at 25–26, May 10, 2018, Case No. 11936-M, *at Docket No. 71*.

[139] Trial Ex. 17.6.

31

included the description "prepare petition schedules & Statements, credit report, credit counseling,

Debtor Education."[140]  Gallon filed an Installment Application on behalf of the Smiths.[141]

       *c.  Conventional Cases*

Between June 13, 2017, the date Gallon filed the first BK Billing Case, and October 17,

2017, the date of the hearing where Gallon first disclosed his relationship with BK Billing to the

Court, Gallon filed nineteen cases that did not utilize the services of BK Billing (the "Conventional

Cases").[142]  Gallon's disclosed attorney fee[143] in the Conventional Cases ranged from $900 to $1,250,

and averaged $1,160.53.[144]  In each of the Conventional Cases, the debtor paid the filing fee on the

filing date and did not seek to pay it in installments.  In each of the Conventional Cases, Gallon

---

    [140]  Trial Ex. 17.7.

    [141]  Case No. 17-12029-M, *at Docket No. 3.*  An amended application was filed at Docket No. 11 to change the due dates for payments.  This amended application was later granted by the Court.  *See Docket No. 13.*

    [142]  The Conventional Cases are Case Nos.  17-11177-M; 17-11179-M; 17-11180-M; 17-11181-M; 17-11182-M; 17-11183-M; 17-11407-M; 17-11408-M; 17-11409-M; 17-11561-M; 17-11562-M; 17-11683-M; 17-11684-M; 17-11685-M; 17-11686-M; 17-11831-M; 17-11934-M; 17-12025-M; 17-12026-M.  In addition, Gallon filed one case during this period that had the hallmarks of a BK Billing Case, e.g., an Installment Application was filed, attorney fees of $1,500 were disclosed, etc., but it was dismissed because the debtor was ineligible for a discharge due to § 727(a)(8) (debtor had received a discharge within 8 years before the filing date).  *See* Case No. 17-11556-M, *Tracie Lynn Tennant.*

    [143]  These amounts are taken from the Disclosure of Compensation filed in each of the Conventional Cases.  These amounts differ from that disclosed on the SOFA in every case.

    [144]  This number represents the attorney fee collected by Gallon, and does not include any amounts for filing fees or other fees Gallon collected for credit reports, counseling, etc.

attached all required schedules and statements to the petition on the filing date, i.e., none were filed as bare-bones cases.[145]

### 3. Court proceedings

Completely unaware of the bifurcated contractual relationships Gallon had entered into with his clients, the Court set the Disclosure of Compensation in the *Wright* case for hearing, noting that the Court had previously ruled that some of the excluded services were required to be performed by counsel for debtors in every Chapter 7 case.[146] In addition, the Court noticed an unusual spate of Installment Applications filed by Gallon in the previous few months without sufficient information for Court review, and set the Installment Agreement in the *Wright* case for hearing to inquire about this practice. It was at this hearing (the "October 17 Hearing") that the Court was first informed of Gallon's use of the BK Billing Model and his factoring arrangement with BK Billing. The UST stated that she had only become aware of the arrangement the day before when preparing for the hearing with Gallon. At the hearing, the Court bluntly asked Gallon to explain "Why wouldn't this be disclosed?" His answer:

> MR. GALLON: Well, it might -- the reason I did not disclose it, Your Honor, in my mind, is that once -- I mean, what, what is happening here is there, is a bifurcation process.
> So the client hires you to perform, to, to file the petition and the creditors and the verification. Then once that's done, you have a second meeting, which is the

---

[145] The only required pleading Gallon failed to consistently attach to the petition in the Conventional Cases was the Payment Advice Certification, which was sporadically submitted as a later pleading.

[146] *See In re Minardi*, 399 B.R. 841, 849–850 (Bankr. N.D. Okla. 2009). After the Disclosure of Compensation was set for hearing, but prior to the October 17 Hearing, Gallon amended the Disclosure of Compensation in the *Wright* case to exclude only 1) Adversary Proceeding; 2) Amendment(s) to Schedules to add creditors; and 3) Objection to Discharge from the services he agreed to perform for debtors. *See* Trial Ex. 14.6.

bifurcation, where they rehire you to finish the, the schedules, statements, and all that. Then once that's done, that's whenever it is factored. And so it is just my way of receiving, I mean, I could collect it from the debtor instead of BK Billing. And so I didn't, I mean, I just didn't think it was something that I was required to disclose. It's my receivable. It's monies that's owed me.[147]

Two days after the October 17 Hearing, Gallon filed an amended Disclosure of Compensation in the *Wright* case (the "Amended Disclosure"), which added the following statement:

Counsel may receive financing from a third-party via a financing or factoring facility. Although in undersigned counsel's view such financing or factoring facility should not be considered an agreement to share compensation, the terms of such agreement will include the granting by undersigned counsel of an interest in the undersigned counsel's accounts and the creditor may have rights to receive payment from the client. Any such financing or factoring facility agreement will clearly provide that client must first give consent to the party relationship and under no circumstances will any of the terms of the financing or factoring facility agreement require counsel to disclose any information that is either confidential or may be considered a privileged communication with the client. The actual agreement will be made available upon request by a party-in-interest.[148]

Gallon has since filed the same Amended Disclosure in all of the BK Billing Cases.

The Court continued the hearing to allow the UST to gather more information regarding Gallon's relationship with BK Billing and decide on a course of action. At the continued hearing, the Court heard from the UST and Gallon, and discussed the UST's Motion filed in the *Wright* case.[149] The Motion proposed an agreement between the UST and Gallon, whereby Gallon would: 1) disgorge his fee in the *Wright* case "in part;" 2) continue to represent debtors in any of the open BK Billing Cases; 3) continue representing debtors in the Non-Factored Cases;[150] and 4) cease doing

---

[147] *See* Trial Tr. at 7 *ll*. 4–18, October 17, 2017, Case No. 17-11936-M, *at Docket No. 29*.

[148] Trial Ex. 14.6.

[149] Case No. 17-11936-M, *at Docket No. 38*.

[150] These are the *Burton*, *Miller*, and *Smith* cases.

business with BK Billing going forward.  A proposed agreed order along those lines was later submitted to (not filed with) the Court that indicated Gallon would disgorge $855 received post-petition (presumably from BK Billing) and cancel any post-petition contract that allowed BK Billing to further collect from Wright.  The Court found the proposed agreement wholly unsatisfactory, and held a telephonic hearing on January 31, 2018, at which it requested more information from Gallon regarding the Captioned Cases.  The Court subsequently issued an Order Scheduling Hearing and Directing Counsel for the Debtor to Address Issues of Compensation.[151]  The Order outlined the concerns of the Court and advised Gallon of the various types of sanctions or remedies the Court was contemplating in these cases.  Among the possible sanctions was disgorgement of all fees paid by debtors in any of the Captioned Cases and the indemnification by Gallon of his clients against any further collection action brought by BK Billing.[152]

On May 10, 2018, the Court held a hearing (the "May 10 Hearing") on these matters. Gallon's arguments and defenses were presented in a pre-hearing brief.[153]  His arguments can be summarized as follows:

1.     Use of the BK Billing Model made Gallon financially worse off than if he had used a conventional, pre-petition billing method.[154]

---

[151]  Case No. 17-11936-M, *at Docket No. 60*.  An order giving the debtors an opportunity to appear and be heard at the hearing was also entered in each of the other 16 Captioned Cases.

[152]  *Id.* at. 7.

[153]  J. Ken Gallon's Brief Regarding Issues of Compensation, Case No. 17-11936-M, *at Docket No. 65*.

[154]  *Id.* at 3.

35

2.     Gallon relied on BK Billing, based on the vigor and sophistication used to induce him to adopt the BK Billing Model.  BK Billing appeared to be a highly professional organization, presented a polished sales pitch, and was a high-level sponsor of the National Association of Consumer Bankruptcy Attorneys annual meeting.  Gallon was given the impression that its model was widely and successfully used.[155]

3.     Gallon did not disclose the BK Billing Model because 1) he relied on BK Billing to advise him of the need to change his usual procedures; 2) he was not aware that BK Billing provided a specific form of disclosure to be filed with the Court; and 3) "it just did not occur to him that such disclosure was required."[156]

4.     Gallon did not understand that participating in the BK Billing program might involve violation of bankruptcy law.[157]

5.     A significant motivation for Gallon to offer the BK Billing Model "was to allow clients to obtain relief from their debt problems more quickly."[158]

6.     Gallon's long-time bankruptcy legal assistant was distracted and ultimately quit during the period he was utilizing the BK Billing Model. He states that many of the mistakes in the disclosures and statements were due to that distracted assistant, his

---

[155]  *Id.* at 5.

[156]  *Id.* at 6.

[157]  *Id.*

[158]  *Id.*

own inept efforts at learning the software, and finally the learning curve of training a new assistant.[159]

7.     Each of the debtors in the Captioned Cases received a discharge without complaint or complication.  Gallon suggests that this is a vindication of any charge that his pre-petition investigation and analysis of the debtors' cases, without preparing schedules and statements, was inadequate.[160]

When questioned about the reason for the bifurcation and performance of services post-petition, Gallon admitted that the practice was not for the benefit of debtors, but was done solely to facilitate the BK Billing Model of collection, by making all fees attributed to post-petition work non-dischargeable.[161]  Gallon valued his time at $250 per hour, based on the amount he charges in Chapter 13 cases.  He acknowledged that he did not accurately account for services provided pre-petition to debtors, and often spent more time working on their cases pre-petition than the debtors paid for before the case was filed.  For example, if a debtor paid only $100 prior to the case being filed, Gallon acknowledged that he spent more than 4/10 of an hour preparing the case for filing.[162]  Under the BK Billing Model, Gallon then shifted the remainder of his fee to be collected post-petition, even though some of the services being compensated had already been provided pre-petition.

---

[159] *Id.*

[160] *Id.* at 6–7.

[161] Trial Tr. at 58 *ll.* 9–24, May 10, 2018, Case No. 11936-M, *at Docket No. 71*.

[162] *Id.* at 60.

Gallon testified that he immediately stopped using the services of BK Billing as soon as he became aware of the concerns of the Court and the UST.  The UST stipulated that Gallon cooperated fully in amending disclosures and providing documents and information during their investigation of these matters.[163]  At the May 10 Hearing, Gallon reiterated his understanding that the factoring of his fee to BK Billing did not involve any sharing of fees since they were simply a collection agency and not providing any services to the debtors.[164]

## Conclusions of Law

*1.  Counsel's duty of disclosure pursuant to § 329*

Section 329 of the Bankruptcy Code lies at the heart of these cases.  Under that section, if a debtor pays or makes an agreement to pay an attorney for services related to a bankruptcy case,[165] that attorney is required to file a statement with the Court that discloses: 1) any compensation paid to the attorney, if the payment was made after one year before the date of the filing of the petition; 2) any compensation agreed to be paid to the attorney, if such agreement was made after one year before the date of the filing of the petition; and 3) the source of such compensation paid or agreed to be paid.[166]  For Chapter 7 debtors' counsel, § 329 is implemented by Bankruptcy Rule 2016(b).[167]

---

[163]  *Id.* at 9–10.

[164]  *Id.* at 64.

[165]  The language of the statute requires disclosure of compensation paid or agreed to be paid "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney." § 329(a).  There is no issue in this case that the services rendered by Gallon to the various debtors were not related to their bankruptcy cases.

[166]  (a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services

In addition to the duties specified in § 329, the Rule adds the requirement that counsel disclose "whether the attorney has shared or agreed to share the compensation with any other entity," including "the particulars of any such sharing or agreement to share by the attorney[.]"[168] These disclosures are required to be filed within 14 days after the case is filed, and supplemented within 14 days after any payment or agreement not previously disclosed.[169]

Counsel's duties of disclosure apply whether or not the attorney applies for compensation from the estate.[170]  The disclosure requirements of § 329 are "mandatory not permissive."[171]  The

---

rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

§ 329(a).

[167]  (b) Disclosure of compensation paid or promised to attorney for debtor

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Rule 2016(b).

[168]  *Id.*

[169]  *Id.*

[170]  § 329.  *See In re Brown*, 371 B.R. 486, 497 (Bankr. N.D. Okla. 2007), *amended by* 371 B.R. 505 (Bankr. N.D. Okla. 2007).

[171]  *See Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir. 1993) (*citing In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991)).

statute is "designed to prevent bankruptcy attorneys from extracting more than their fair share from prospective debtors willing to do whatever is necessary to obtain their counsel of choice and avoid unfavorable bankruptcy proceedings."[172]  "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient."[173]  "Absent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy."[174]

Rule 2017 directs the court to review any payments or transfers, or agreements for either, made directly or indirectly by debtors to an attorney, either before or after the filing of the

---

[172]  *Id.* (*citing In re NBI, Inc.*, 129 B.R. 212, 222 (Bankr. D. Colo. 1991)).

[173]  *In re Woodward*, 229 B.R. 468, 474 (Bankr. N.D. Okla. 1999) (*quoting In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)).

[174]  *In re Perrine*, 369 B.R. 571, 580 (Bankr. C.D. Cal. 2007).

bankruptcy case, to determine if those payments or transfers are excessive.[175]   According to the

advisory committee's note appended to the Rule's original publication,

> This rule . . . is premised on the need for and appropriateness of judicial scrutiny of
> arrangements between a debtor and his attorney to protect the creditors of the estate
> and the debtor against overreaching by an officer of the court who is in a peculiarly
> advantageous position to impose on both the creditors and his client.[176]

If the payment or agreement is found to exceed the reasonable value of the services provided by the

attorney, the Court may cancel the agreement or disgorge any such payment to its source.[177]

---

[175]   *See In re Brown*, 371 B.R. at 497.  Rule 2017 reads:

(a) Payment or transfer to attorney before order for relief

On motion by any party in interest or on the court's own initiative, the court after notice
and a hearing may determine whether any payment of money or any transfer of property
by the debtor, made directly or indirectly and in contemplation of the filing of a petition
under the Code by or against the debtor or before entry of the order for relief in an
involuntary case, to an attorney for services rendered or to be rendered is excessive.

(b) Payment or transfer to attorney after order for relief

On motion by the debtor, the United States trustee, or on the court's own initiative, the
court after notice and a hearing may determine whether any payment of money or any
transfer of property, or any agreement therefor, by the debtor to an attorney after entry of
an order for relief in a case under the Code is excessive, whether the payment or transfer
is made or is to be made directly or indirectly, if the payment, transfer, or agreement
therefor is for services in any way related to the case.

Rule 2017.

[176]   Rule 2017 advisory committee's note (*citing* 2 Collier on Bankruptcy ¶329.02 (15th
ed. 1980); MacLachlan, Bankruptcy 318 (1956)).

[177]   § 329 (b) reads:

(b)  If such compensation exceeds the reasonable value of any such services, the court
may cancel any such agreement, or order the return of any such payment, to the extent
excessive, to–

The consequences of an attorney's failure to comply with the disclosure requirements of § 329 can be severe, including forfeiting the right to receive *any* compensation for services rendered to the debtor.[178] "Disgorgement of fees as a result of inadequate disclosure by counsel is a matter left to the sound discretion of the bankruptcy court."[179] "The imposition of a disgorgement order should be commensurate with the egregiousness of the conduct and will depend on the particular facts of each case."[180] "The Court may sanction failure to disclose 'regardless of actual harm to the estate.'"[181] This Court has previously adopted a strict position regarding failure of debtors' counsel to disclose compensation arrangements to the Court:

> This Court takes the requirement of full disclosure under § 329 seriously, for to do less is to judicially repeal the statute. . . .Were the Court to require less than full disclosure, the purpose behind § 329(a) would be defeated. Counsel could avoid disclosure of any or all of the fees paid to them by making a covert decision that the undisclosed fee was so unrelated to the bankruptcy case that its disclosure was not required, and eliminating the possibility of Court review in the process. The Court's

---

> (1) the estate, if the property transferred–
>
> (A) would have been property of the estate; or
>
> (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
>
> (2) the entity that made such payment.

[178] *In re Inv. Bankers*, 4 F.3d at 1565; *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 848–49 (10th Cir. BAP 1997).

[179] *In re Brown*, 371 B.R. at 499.  *See also In re Stewart*, 583 B.R. 775, 783 (Bankr. W.D. Okla. 2018) (*citing In re Brown*).

[180] *In re Brown*, 371 B.R. at 499 (*citing In re Hackney*, 347 B.R. 432, 443 (Bankr. M.D. Fla. 2006)) (internal citations and quotations omitted).

[181] *In re Smitty's Truck Stop*, 210 B.R. at 849 (*citing In re Maui 14K, Ltd.*, 133 B.R. 657, 660 (Bankr. D. Haw. 1991)).

> ability to make a meaningful review of attorney's fees would be hindered if not
> destroyed. Such a result can be neither condoned nor allowed.[182]

Nothing presented to the Court in these matters suggests that any lesser standard should prevail.  Nor does the Court find that a "pure heart," without a subjective intent to violate the Code or Rules, provides counsel any defense to the failure to file the proper disclosures under § 329.[183]  "Negligent or inadvertent omissions 'do not vitiate the failure to disclose.'"[184]

The Court finds Gallon's original Disclosure of Compensation in each of these cases to be grossly misleading and indicative of a wanton disregard—*to the point of negligence*—for the level of candor required under § 329.  Some of Gallon's errors defy comprehension.  For example, in the *Wright* case, Gallon disclosed that he had agreed to accept $1,500 for legal services with a balance due of $1,425, when he actually had agreed to receive $855, plus $213.75 paid to escrow, from BK Billing.[185]  The statement is flat-out deceptive, whether or not that is what Gallon intended.  The disclosure conflates the total amount a debtor agreed to pay for his services with the amount he agreed to accept for his services, even though those amounts differ by several hundred dollars in each of the BK Billing Cases.

---

[182]  *In re Woodward*, 229 B.R. at 474–75 (disgorgement of all fees).  *See also In re Lewis*, 309 B.R. 597 (Bankr. N.D. Okla. 2004) (same); *In re Brown*, 371 B.R. at 486 (same).  *Accord In re Inv. Bankers*, 4 F.3d at 1565–66; *In re Smitty's Truck Stop*, 210 B.R. at 848.

[183]  *In re Stewart*, 583 B.R. at 782.

[184]  *In re Smitty's Truck Stop*, 210 B.R. at 848 (*quoting Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.*), 63 F.3d 877, 881 (9th Cir. 1995)) (internal citations omitted).

[185]  Trial Ex. 14-4, 14-6.

Other errors demonstrate the general level of sloppiness evident in much of Gallon's record keeping. For example, in the *Wright* case, Gallon disclosed that "prior to the filing of this statement I have received $75," even though his Pre-Petition Agreement indicated Ms. Wright had agreed to pay $200 plus an additional $42 in fees. An internal office memo indicated that she had actually paid $200. Although Gallon blamed such mistakes on the loss of his long-time assistant and the difficulty in training a new one, Gallon has duties of competence to his clients that transcend bankruptcy law.[186] He should not accept clients if he does not have the basic skills to file their cases in a complete and competent manner. This Court does not accept laying the blame at the foot of an employee as an excuse.

Of equal concern is that Gallon indicated in each Disclosure of Compensation that he had not shared his fee with any other person. Both in his written brief and testimony, Gallon insisted on his understanding that he was not sharing fees because "it was his receivable" that he could dispose of or sell in any way he wanted, and that BK Billing was simply a collection agency. The Court is not particularly concerned here with the legal or ethical violations involved with any possible sharing arrangement.[187] What concerns the Court is Gallon's rather brazen position, with no citation to authority, that collection of a fee from his client that is split between himself & BK Billing does

---

[186] Rules of Prof'l Conduct, Rule 1.1, Okla. Stat. tit. 5, ch. 1, app. 3-A ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.").

[187] *See, e.g.*, § 504(a) ("Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share–(1) any such compensation or reimbursement with another person[.]") This statute suggests that while sharing of fees is prohibited in some circumstances, not every receipt of fees related to a bankruptcy case is affected. *But see* Rules of Prof'l Conduct, Rule 5.4(a), Okla. Stat. tit. 5, ch. 1, app. 3-A ("A lawyer or law firm shall not share legal fees with a nonlawyer[.]") (listing several exceptions that do not apply here).

not constitute sufficient "sharing of compensation" that it should—*at a minimum*—be disclosed to the Court.  Courts have found that a failure to comply with disclosure requirements is sanctionable even if proper disclosure would have shown no violation of the Code or Rules.[188]

Gallon filed an Amended Disclosure in each of the cases in an effort to remedy the deficiencies in the original.  His efforts fell woefully short.  His statement that "counsel may receive financing from a third-party" does not adequately disclose that in each of the affected cases he <u>*did in fact*</u> receive such financing, and on what terms.  He goes on to state his view that the arrangement does not involve sharing of fees, but gives no particulars of the arrangement.  Offering to make the agreement available upon request does not satisfy Rule 2016(b)'s requirement of disclosing "the particulars of any such sharing or agreement to share."[189]

### 2.  Counsel's duty of candor to the tribunal

In addition to the statutory duties provided in the Bankruptcy Code, Gallon has other duties to his clients and the Court based on his role as an officer of the court.  An attorney becomes an officer of the court upon taking an oath and meeting other requirements imposed by state law.[190]  In Oklahoma, that oath requires counsel to show complete candor toward the tribunal.[191]  Oklahoma

---

[188]  *In re Stewart*, 583 B.R. at 782.  *See also In re Waldo*, 417 B.R. 854, 893 (Bank. E.D. Tenn. 2009).

[189]  Rule 2016(b).

[190]  Rules of Prof'l Conduct, Preamble cmt. 1, Okla. Stat. tit. 5, ch. 1, app. 3-A ("A lawyer, as a member of the legal profession, is a representative of clients, *an officer of the legal system* and a public citizen having special responsibility for the quality of justice.") (emphasis added).

[191]  The oath required to practice law in Oklahoma reads as follows:

I do solemnly swear that I will support, protect and defend the Constitution of the

45

Rule of Professional Conduct 3.3 reinforces the requirement of candor.[192]  Such candor is vital to the integrity of the bankruptcy process itself.

The Court is troubled by Gallon's practice of charging a higher fee to his clients that use the BK Billing Model than to his conventional clients.  Gallon charged his average conventional client $1,250 when the fee was fully paid prior to filing a debtor's petition.  Under the BK Billing Model, a debtor was charged a total of $1,500 for attorney fees.  From the debtor's perspective, that is a $250 premium, or 20% above the fee charged in a conventional case, for the convenience of paying the fee over 12 months.  From Gallon's perspective, the math is even worse.  For example in the *Wright* case, Gallon invoiced Wright's account to BK Billing for $1,425.  He actually received $855 from BK Billing.  That means Wright agreed to pay a 66% markup over the amount Gallon actually

---

United States, and the Constitution of the State of Oklahoma; that I will do no falsehood, or consent that any be done in court, and if I know of any I will give knowledge thereof to the judges of the court, or some one of them, that it may be reformed; I will not wittingly, willingly or knowingly promote, sue, or procure to be sued, any false or unlawful suit, or give aid or consent to the same; I will delay no person for lucre or malice, but will act in the office of attorney in all courts according to my best learning and discretion with all good fidelity as well to the court as to my client, so help me God.

Okla. Stat. tit. 5, ch. 1, § 2.  *See also id.,* app. 5, § 1.

[192]  Rule 3.3. Candor Toward The Tribunal:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]

Rules of Prof'l Conduct, Rule 3.3, Okla. Stat. tit. 5, ch. 1, app. 3-A. *See also id.*, Preamble cmt. 12, Okla. Stat. tit. 5, ch. 1, app. 3-A ("Every lawyer is responsible for observance of the Rules of Professional Conduct.").

received for providing her services.[193]  Additionally, if Gallon was willing to accept roughly $1,069, or 75% of $1,425, in a typical BK Billing Case, assuming he received the escrowed payments, the Court could rightly conclude that he consistently overcharges his conventional clients for the value of his services.  Gallon's only defense of the practice of charging higher fees to BK Billing clients was that it was encouraged by BK Billing as part of their training package.

It is clear to the Court that a prominent feature of the BK Billing Model is the designation of the bulk of services as "post-petition" in order to render them beyond the Chapter 7 discharge and therefore collectable by BK Billing.  There are (at least) two problems with this approach.  First, by waiting until after the petition is filed to perform most of the actual services, such as filing out schedules and statements, counsel risks overlooking essential information regarding the debtors' financial condition, which may have been missed in the cursory interview conducted pre-petition.  Counsel may discover too late that he or she should have chosen a different chapter, or not filed the case at all.  Second, the amount of Gallon's fees designated pre- or post-petition was motivated by how much money the debtor was able to pay up front, and not related in any way to when Gallon's services were actually performed.  Valuing his time at $250 per hour, Gallon admitted that in several cases he spent much more time pre-petition than he was paid for, but then designated the remaining fee as "post-petition," thus turning an otherwise dischargeable pre-petition claim into a non-discharged claim.[194]  Such a scheme works a fraud both on the debtor and the Court.

---

[193]  Even if Gallon had received the additional escrow payment, Wright would have paid a 33% markup over the amount Gallon received.

[194]  Trial Tr. at 60, May 10, 2018, Case No. 11936-M, *at Docket No. 71*.

Of additional concern to the Court is that Gallon indicated that the source of the compensation to be paid to him was the debtor, even though Bankruptcy Form 2030 presented him with another option.  Courts have consistently held that payment of funds from a third-party payor to pay a debtor's legal fees does not alter counsel's obligation of proper disclosure.[195]  In each of the BK Billing Cases except *Gomes*, Gallon received a direct deposit equal to 60% of the invoiced account value from BK Billing, with an agreement he would be paid an additional 15% if the accounts were sufficiently remitted by the debtors.[196]  Clearly, "the "source of such compensation" is directly required to be disclosed under § 329.  Gallon tries to deflect responsibility for this failure by stating that he relied on BK Billing to train and advise him on the use of their model.  Such reliance on BK Billing in the discharge of his professional duties and judgment is a breach of the Oklahoma Rules of Professional Conduct.[197]  Despite not being "trained" or provided a form by BK Billing, Gallon certainly understood that he was only indirectly being compensated by his clients, but that the actual funds he received came directly from BK Billing.  He should have known that the information provided to the Court in the Disclosure of Compensation filed in these cases was grossly

---

[195]  *In re Stewart*, 583 B.R. at 781.

[196]  Under the original AR Agreement, Gallon received 70% of the invoiced Gomes account, with no escrowed payment.

[197]  *See, e.g.*, Rules of Prof'l Conduct, Rule 5.4(c), Okla. Stat. tit. 5, ch. 1, app. 3-A ("A lawyer shall not permit a person who recommends, employs, *or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services*.") (emphasis added); *Id.* Rule 1.8(f) ("A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is *no interference with the lawyer's independence of professional judgment* or with the client-lawyer relationship[.]") (emphasis added); Rule 1.7(a) ("A concurrent conflict of interest exists if: . . .(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . *a third person or by a personal interest of the lawyer*.") (emphasis added).

misleading, if not out right false.  His declaration that it simply "did not occur to him that such disclosure was required" is both disheartening and astonishing.  This Court has published no less than three opinions directly related to the failure of debtors' counsel to properly disclose all financial dealings with their clients.[198]  As an officer of the Court, Gallon is expected to be aware of such rulings.

Gallon tries to rationalize his failures by citing the blind faith he put in BK Billing as a company.  He suggests that he was induced to adopt the BK Billing Model based on the company's slick sales pitch and high-profile sponsorship of a leading bankruptcy conference.  While the Court does not doubt that BK Billing rolled out a persuasive marketing campaign, the Court believes that any reasonable attorney would have at least questioned the "too good to be true" aspect of the model.  Instead, Gallon blindly adopted the BK Billing Model, without conducting even a minimal inquiry into the legal or ethical issues that such a system might raise.  The Court finds that such abdication of his professional judgment is unreasonable.

This Court has previously noted the bankruptcy system is a fragile one, built on the principles of full and candid disclosure.[199]  Its operation and survival rely on the integrity and professionalism of its practitioners.  Only through serendipity were these matters brought to the Court's attention.  "This is not an area where the Court will engage in or tolerate a game of 'catch me if you can,' or allow 'I guess I did not know better' to be a palatable excuse."[200]  The Court finds Gallon's

---

[198] *In re Woodward*, 229 B.R. at 468; *In re Lewis*, 309 B.R. at 597; *In re Brown*, 371 B.R. at 486.

[199] *In re Lewis*, 309 B.R. at 602.

[200] *Id.* at 603.

disclosures regarding the nature and source of his compensation in these cases to be grossly inadequate to the point of being misleading. The Court is aware that it has discretion when determining the degree of sanctions for non-disclosure.[201] The Court finds Gallon's entire fee in each of these cases to be unreasonable. His failures are sufficiently severe and pervasive to warrant disgorgement. The Court would be justified in disgorging all fees received by Gallon or collected by BK Billing, but finds that such an order would be administratively unworkable, since some of the funds paid by the debtors pre-petition were allocated to court fees and other miscellaneous services. The Court will limit disgorgement to the value of fees actually collected by BK Billing from each of the debtors in the Captioned Cases after their petitions were filed.[202] Such funds shall be remitted by Gallon to the debtor that made the payment. The Post-Petition Agreements in each case are found to be void, and neither Gallon nor BK Billing may enforce any claim against the debtors under those contracts.[203] The Court is aware this is a harsh sanction, but anything less would minimize the serious nature of Gallon's conduct.

## 2. Debtors' violations of Rule 1006

Section 1930 of title 28 of the United States Code sets out the schedule of fees to be collected by the clerk when a bankruptcy case is filed. The statute explicitly allows a debtor in a voluntary

---

[201] *In re Brown*, 371 B.R. at 499; *In re Stewart*, 583 B.R. at 783.

[202] To be abundantly clear, these fees are ordered disgorged *from Gallon*, and not from BK Billing, over which the Court has not exercised jurisdiction. In addition, the Court will not disturb the voluntary payment of $1,325 made directly to Gallon from the Millers in Case No. 17-12027-M.

[203] The Court offers no opinion on how this ruling affects the contractual duties between Gallon and BK Billing.

case to pay the required fee in installments.[204]  Rule 1006 implements this statute, but adds that a debtor that utilizes the installment provision may make no further payments "to an attorney or any other person who renders services to the debtor in connection with the case" until the filing fee is paid in full.[205]

In eleven of the seventeen Captioned Cases, Gallon filed an Installment Application. In each of those cases, the application included a statement executed by both the debtors and Gallon that the debtors understood they must pay their entire filing fee before they make any more payments or transfer any more property to an attorney *or anyone else* for services in connection with their bankruptcy case.[206]  In eight of those cases, due to the scheme orchestrated by Gallon, debtors unwittingly made payments to BK Billing toward Gallon's attorney fee before their entire filing fee was paid to the Court, in direct violation of Rule 1006.  The remaining three cases were not submitted to BK Billing for factoring, therefore no violation occurred.

Gallon, as an attorney admitted to practice before this Court, is charged with knowing and understanding the Federal Rules of Bankruptcy Procedure, as well as the applicable provisions of the Bankruptcy Code.  His signature on the Installment Application was a violation of both his ethical and statutory duties.  Rule 9011(b)(3) outlines counsel's ethical duty of candor in signing an application submitted to the Court:

(b) Representations to the court

---

[204]  28 U.S.C. § 1930(a) (hanging paragraph).

[205]  Rule 1006(b)(3)("All installments of the filing fee must be paid in full before the debtor or chapter 13 trustee may make further payments to an attorney or any other person who renders services to the debtor in connection with the case.").

[206]  *See, e.g.*, Case No. 17-11936-M, *at Docket No. 4*.

51

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,–
>
> * * *
>
>    (3) *the allegations and other factual contentions have evidentiary support* or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.][207]

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") was enacted "to correct perceived abuses of the bankruptcy system."[208]  Among its reforms were §§ 526–528, which target debt relief agencies, "*i.e.*, professionals who provide bankruptcy assistance to consumer debtors."[209]  As a debt relief agency, Gallon is bound by duties of candor therein.[210]  The relevant subsection of § 526 reads as follows:

> (a) A debt relief agency shall not–
>   * * *
>    (2) *make any statement*, *or counsel or advise any assisted person* or prospective assisted person *to make a statement* in a document filed in a case or proceeding under this title, *that is untrue or misleading*, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading[.][211]

Considering he set these events in motion by factoring his fee to BK Billing, Gallon knew or should have known that BK Billing would begin collection activity prior to the debtors' court fees being paid in full.  He is also charged with knowing that such payment to BK Billing was a violation of

---

[207]  Rule 9011(b)(3) (emphasis added).

[208]  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231–32 (2010).

[209]  *Id.* at 232.

[210]  *Id.* (holding that consumer debtors' attorneys qualify as "debt relief agencies," as defined in § 101(12A), and are therefore subject to §§526–528).

[211]  § 526 (as amended by Bankruptcy Technical Corrections Act of 2010, Pub. L. 111-327, § 2(a)(2), 124 Stat. 3557) (emphasis added).

the debtors' duties under Rule 1006.  His signature on the Installment Agreements is a violation of his duty of candor under both Rule 9011(b)(3) and § 526(a)(2).  Gallon compounded the violation of § 526(a)(2) by advising his clients to sign the Installment Agreements and causing them to make misleading statements regarding their payment of his fees.

The Court does not take these violations lightly.  The bankruptcy system requires complete candor from both debtors and their engaged professionals.[212]  Standing alone, the Court would find cause to sanction Gallon under Rule 9011(c) or § 526(c)(5) for filing and endorsing the debtors' misleading statements found in the Installment Agreements.  The Court notes that in all eleven cases, all required Court filing fees were eventually fully paid, either by the debtors or Gallon, and each of the debtors received their discharge.  Therefore, despite the authority to do so, the Court will not impose additional sanctions.

### 3.  Counsel's duties under BAPCPA

As soon as Gallon became aware of his missteps in these cases, he worked diligently to assist the UST to investigate this matter and cut ties with BK Billing.  As such, he offered no defense of the BK Billing Model of bifurcating services into pre- and post-petition categories or its factoring practice, which required debtors to incur debt to pay their attorney's fee.  Several courts across the country have faced variations on this theme.  Some have offered advice and recommendations in order to craft an acceptable scheme whereby attorneys may offer bifurcated services.[213]  Others have

---

[212]  *See Grogan v. Garner*, 498 U.S. 279, 287 (1991) (The Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'") (*quoting Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). *See also* Rule 9011.

[213]  *Bethea v. Robert J. Adams & Assocs.*, 352 F.3d 1125, 1128 (7th Cir. 2003) (proposes bifurcation of services model; pre-BAPCPA case); *Walton v. Clark & Washington, P.C.*, 469 B.R. 383 (Bankr. M.D. Fla. 2012) (endorses specific bifurcation of services model; provides

noted that various provisions added to the Code by BAPCPA appear to thwart such schemes.[214]  This

Court has reviewed the cases carefully and believes that BAPCPA presents serious impediments to

the legality of this kind of bifurcated services scheme, such as the BK Billing Model.[215]  The

---

guidance); *In re Slabbinck*, 482 B.R. 576, 584 (Bankr. E.D. Mich. 2012) (same); *In re Waldo*, 417 B.R. 854 (Bank. E.D. Tenn. 2009) (rejects model utilized by counsel; endorses bifurcation of services model in dicta); *In re Lawson*, 437 B.R. 609 (Bankr. E.D. Tenn. 2010) (same); *In re Griffin*, 313 B.R. 757, 769–70 (Bankr. N.D. Ill. 2004) (endorses bifurcation of services model in dicta; provides guidance); *In re Abdel-Hak*, No. 12-46329-MBM, 2012 WL 5874317, at *7 (Bankr. E.D. Mich. Nov. 16, 2012) (same).

[214]  *See In re Jackson*, No. 14-11415, 2014 WL 3722019 (Bankr. W.D. La. July 24, 2014) (two contract procedure used by counsel did not comply with "material requirements" of § 528; both agreements found void under § 526(c)(1)); *In re Green*, No. 14-11458, 2014 WL 3724986 (Bankr. W.D. La. July 24, 2014) (same).  *But see In re Slabbinck*, 482 B.R. at 584 n.1 (acknowledged §§ 526–528 added by BAPCPA, but ignored because not raised by any party).

[215]  Relevant subsections of § 526 read as follows:
(a) A debt relief agency shall not–
   (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;
   (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;
   (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to–
            (A) the services that such agency will provide to such person; or
            (B) the benefits and risks that may result if such person becomes a debtor in a case under this title; or
   (4) advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or representing a debtor in a case under this title.
(b) Any waiver by any assisted person of any protection or right provided under this section shall not be enforceable against the debtor by any Federal or State court or any other person, but may be enforced against a debt relief agency.
(c)(1) Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this

54

difficulty here is that no one appears in these cases to defend the model or offer an alternative

> section, section 527, or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person.
>
> (2) Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have–
>
>> (A) intentionally or negligently failed to comply with any provision of this section, section 527, or section 528 with respect to a case or proceeding under this title for such assisted person;
>> (B) provided bankruptcy assistance to an assisted person in a case or proceeding under this title that is dismissed or converted to a case under another chapter of this title because of such agency's intentional or negligent failure to file any required document including those specified in section 521; or
>> (C) intentionally or negligently disregarded the material requirements of this title or the Federal Rules of Bankruptcy Procedure applicable to such agency.
>
> ***
>
> (5) Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may--
>
>> (A) enjoin the violation of such section; or
>> (B) impose an appropriate civil penalty against such person.

§ 526 (as amended by Bankruptcy Technical Corrections Act of 2010, Pub. L. 111-327, § 2(a)(2), 124 Stat. 3557).

Section 528 provides in part:

> (a) A debt relief agency shall–
>
> (1) not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously–
>
>> (A) the services such agency will provide to such assisted person; and
>> (B) the fees or charges for such services, and the terms of payment;
>
> (2) provide the assisted person with a copy of the fully executed and completed contract;

§ 528(a)(1–2).

argument to the Court.  That seems like shaky ground to rule or comment on the validity of the model.  Because the Court has disposed of these matters under section 329, it is not necessary to review them further on alternative grounds.  Therefore the Court will wait until issues of bifurcation of services and fee factoring are before it in an actual case or controversy before it weighs in on §§526 and 528.  The Court raises these issues in the hope that counsel considering use of a similar scheme will carefully review the legal and ethical provisions of BAPCPA and state ethics rules *before* they file a petition in this district.

### Conclusion

Gallon must disgorge the value of all fees actually collected by BK Billing from the debtors after their petitions were filed in each of the Captioned Cases.  Such funds shall be remitted by Gallon to the debtor that made the payment.  The Post-Petition Agreements in each case are found to be void, and neither Gallon nor BK Billing may enforce any claim against the debtors under those contracts.  A separate order consistent with this Memorandum Opinion is entered concurrently herewith in each of the Captioned Cases.

DATED this 4th day of September, 2018.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

7252.6

56